## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **NO. 1:20-CR-00173 (RC)** |
| | : | |
| **v.** | : | |
| | : | |
| **YANG BAN,** | : | |
| | : | |
| **Defendant.** | : | |

### STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Yang Ban, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which it is pleading guilty, conspiracy to launder monetary instruments to promote bank fraud and sanctions violations, in violation of 18 U.S.C. § 1956.

### Statement of Facts

### I.      STATUTORY BACKGROUND

####       A.      North Korean Sanctions Regulations

1.      On March 15, 2016, the President, to take additional steps with respect to the previously described national emergency, issued Executive Order 13722 to address the Government of North Korea's continuing pursuit of its nuclear and missile programs. Pursuant to that authority, on March 16, 2016, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations." See 31 C.F.R. § 510.101 *et seq*. Executive Order 13722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC.

2.      Foreign financial institutions maintain U.S. dollar bank accounts at banks in the United States ("Correspondent Banks").  Correspondent Banks accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution.  See 31 C.F.R. § 1010.605.  Correspondent Banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars and to conduct currency conversions to/from U.S. dollars.  It is through these accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

3.      The North Korea Sanctions Regulations further prohibited the export of financial services, to include Correspondent Banking activities, by any U.S. person.

4.      The North Korea Sanctions Regulations define "U.S. person" as any:

     a.      United States citizen or permanent resident alien;

     b.      entity organized under the laws of the United States or any jurisdiction within the United States, including foreign branches; or

     c.      any person in the United States.

**B.      Bank Secrecy Act Criminalizes Correspondent Banking With North Korean Financial Institutions**

5.      According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act as well as sanctions programs administered by

OFAC. The Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system from illicit use.

6.      The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures when dealing with foreign financial institutions engaged in correspondent banking of U.S. dollar transactions.

7.      The Bank Secrecy Act broadly defines foreign financial institutions to include dealers of foreign exchange and money transmitters in a manner not merely incidental to their business. *See* 31 C.F.R. § 1010.605(f).

8.      Section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A as part of the Bank Secrecy Act, gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. A Section 311 finding and the related special measure are implemented through various orders and regulations incorporated into 31 C.F.R. Chapter X.  One such special measure imposed under Section 311 protects the integrity of the U.S. financial system by prohibiting financial institutions from causing U.S. financial institutions to engage in any type of financial transaction with any entity within the jurisdiction deemed an area of money laundering concern.

9.      On June 1, 2016, FinCEN issued a Notice of Finding for a Section 311 designation of North Korea. Specifically, FinCEN's finding deemed *the entire North Korean financial sector* as a jurisdiction of primary money laundering concern.  *See* Federal Register, Vol. 81, No. 107 (June 3, 2016).

10.     In November 2016, FinCEN published a final rule implementing the most severe special measure against the entire North Korean financial sector. *See* Federal Register, Vol. 81,

No. 217 (Nov. 9, 2016); 31 C.F.R. § 1010.659.  The special measure bars U.S. financial institutions from maintaining a correspondent account for any North Korean financial institution or any party acting on its behalf.  A second special measure requires covered financial institutions to exercise "enhanced due diligence" and to take reasonable steps not to process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involves a North Korean financial institution. Because of the finding that the entire North Korea financial sector was a primary money laundering concern, FinCEN cut all North Korean financial institutions -- and entities acting on their behalf -- off from any trade in U.S. dollar transactions via correspondent banking.  The Chairman of the House Foreign Affairs Committee stated that the Section 311 designation "impacts all financial institutions, anywhere, who now have a choice to make between doing business with North Korea and being cut off from financial transactions with the United States and the international financial system."

11.    A bank that violates the Section 311(b) special measure, codified at 31 U.S.C. § 5318A(b), or of the regulations published at 31 C.F.R. § 1010.659, is punishable criminally pursuant to 31 U.S.C. § 5322.

12.    The North Korean financial sector is comprised of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of WMD and the development of ballistic missiles in violation of international and U.S. sanctions," and are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism [] controls."  81 Fed. Reg. at 78715.

13.    The United Nations Panel of Experts found that once North Korea could register a front company without overt links to the country through the assistance of foreign nationals, it

became significantly easier for its firms to pass rudimentary due diligence checks by financial institutions and open and maintain bank accounts.

### C.   Bank Fraud

14.     The bank fraud statute is broadly construed to reach anyone engaged in a scheme or artifice to defraud, including a scheme to actively conceal material information through deceptive conduct, with the intent to mislead and suppress the truth, even in the absence of an independent legal duty to disclose such information

15.     The Government is not required to prove that a defendant intended to cause financial harm, nor that the defendant ultimately caused harm to a financial institution.

16.     Exposing a bank to a risk of loss establishes liability under the bank fraud statute. It is not required to evaluate whether the scheme would create a substantial likelihood of risk of loss to a bank to support a bank fraud conviction.  Rather, all that is needed is that the scheme placed the financial institution at risk of civil liability or financial loss.

17.     As a result of the North Korea Sanctions Regulations, the FinCEN 311 action, and overall risk management, Correspondent Banks began in March 2016 refusing to process any U.S.-dollar wire transactions involving entities in North Korea.

18.     In turn, North Korean entities used front companies to pay their counterparties in U.S. dollars.  The use of front companies and stripping material information, such as the true counterparties to the transaction, from wire transfer instructions influence the decision-making of

the Correspondent Banks into processing transactions they otherwise normally would not, and thus constitutes bank fraud.

19.     Correspondent Banks that processed transactions for North Korean customers would be subject to criminal and civil penalties for Bank Secrecy Act, anti-money laundering, and sanctions violations.

## II.     ENTITIES

20.     Yang Ban: a company established in the British Virgin Islands in 2014. Yang Ban covertly conducted U.S. dollar transactions for its North Korean customers.  Yang Ban sold and traded commodities to customers in North Korea.

21.     SINSMS Pte. Ltd: a Singapore-based logistics commodities company that supplied customers located in North Korea.   The Treasury Department's Office of Foreign Assets Control designated China-based Dalian Sun Moon Star International Logistics Trading Co., Ltd. and its Singapore-based affiliate, SINSMS, on August 15, 2018. These companies worked together to facilitate illicit shipments to North Korea using falsified shipping documents, including exports of alcohol, tobacco, and cigarette-related products.

## III.     THE SCHEME

### A.     Background on the Scheme

22.     Yang Ban was aware that it needed to distance itself from North Korean front companies in order to protect it from additional scrutiny from banks that process U.S. dollar transactions, and thus, are obligated to conduct anti-money laundering and sanctions compliance checks on all transactions.

23.     In 2016, Yang Ban attempted to establish a joint venture between it and a North Korean trading company. This joint venture would have allowed Yang Ban even greater access to the North Korean market.

24.     Between February 8, 2017 and May 14, 2018, Yang Ban conducted U.S. dollar transactions totaling $561,428.39.  These transactions transited through U.S. correspondent bank accounts.

25.     For example, on July 5, 2017, Yang Ban and SINSMS engaged in a check transaction totaling approximately $263,400.00.

26.     During this time, Yang Ban violated U.S. the money laundering statute by making these U.S. dollar payments which promoted bank fraud and sanctions violations by providing false information and causing the false provision of information to U.S. banks processing U.S. dollar transactions on behalf of Yang Ban's customers in North Korea.

27.     During the relevant time period, Yang Ban was aware that banks would not process U.S. dollar transactions on behalf of end users located in North Korea due to sanctions compliance and anti-money laundering banking rules. In order to ensure the banks would process Yang Ban's U.S. dollar transactions, North Korean co-conspirators utilized a network of front companies located throughout the world to hide the identity of its North Korean customers.

28.     The co-conspirators employed front companies registered in Hong Kong, China, Thailand, Singapore, and elsewhere, when making payments related to this scheme.

29.     In order to track the payments by the North Korean customers, Yang Ban and its co-conspirators would receive notification from either the North Korean buyer or a representative of the front company, either via e-mail, telephone, or other type of message, confirming the payment had been sent, the payment amount, and the identity of the remitting front company.

Yang Ban and its co-conspirators would then match up that information with the payment information on its bank records. Yang Ban and its co-conspirators maintained a separate ledger system documenting incoming payments from the North Koreans and the front companies that made payment on their behalf.

**B.**  **Misrepresentations to Banks**

30.     Yang Ban and its co-conspirators maintained bank accounts overseas, which maintained correspondent bank accounts with banks in the United States.  In order to maintain these bank accounts while conducting financial transactions on behalf of North Korean customers, Yang Ban and its co-conspirators provided false information to the banks regarding the identity and location of their North Korean customers and/or failed to disclose the North Korean nexus to their business.  Yang Ban and its co-conspirators were aware that the banks were concerned about the risk involved in North Korean business, and that the banks would not process U.S. dollar transactions if they knew Yang Ban's customers were located in North Korea.

31.     On or about September 30, 2016, Yang Ban caused an employee to inform a North Korean customer that Yang Ban was unable to use a related company for further business with North Korea due to bank restrictions on such transactions.

32.     Yang Ban and its co-conspirators discussed creating false shipping documents which listed the port of destination as Dalian, China, when in fact the parties knew the true destination was North Korea.  Yang Ban and its co-conspirators needed these falsified documents to provide to any banks or companies that might conduct due diligence on the related transactions/shipments.

33.     For example, in May 2017, Yang Ban and its co-conspirators discussed which companies would ship to North Korea. On May 10, 2017, a North Korean co-conspirator notified

Yang Ban and its co-conspirators that one company would ship to Nampo, North Korea, but would require two separate sets of shipping documents. One set of documents would be free of any indication that the shipment was going to North Korea, and a second set of documents would contain the North Korea details.

34.     This proffer of evidence is not intended to constitute a complete statement of all facts known by the parties, but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for the defendant's plea of guilty to the charged crimes.  This Statement of the Offense fairly and accurately summarizes and describes some of the defendant's actions and involvement in the offenses to which it is pleading guilty.

Respectfully Submitted

Michael R. Sherwin
Acting United States Attorney
N.Y. Bar No. 4444188

BY:     _____
        Zia M. Faruqui
        Assistant United States Attorney


        John C. Demers
        Assistant Attorney General
        National Security Division


        _____/s/ Dave Recker_____
        David C. Recker
        National Security Division, Trial Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I have read the Statement of Offense setting forth the facts related to the corporate guilty plea to one count of Conspiracy to Launder Funds, in violation of 18 U.S.C. § 1956.  I am aware that the corporation has discussed this proffer fully with its attorneys. The corporation and I fully understand this proffer and the corporation acknowledges its truthfulness, agree to it and accept it without reservation. The corporation does this voluntarily and of its own free will.  No threats have been made nor am I under the influence of anything that could impede my ability to understand this proffer fully.

Date: _2020 / 8 / 25_

_____

Pauson Lek Pow Sheng
Authorized Corporate Representative,
Yang Ban


## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting the government's proffer of evidence related to my client's guilty plea to one count of Conspiracy to Launder Funds, in violation of 18 U.S.C. § 1956.  I have reviewed the entire proffer with my client and have discussed it with my client fully. I concur in my client's agreement with and acceptance of this proffer.

Date: _Aug 25, 2020_

_____

Bill Coffield, esq.
Counsel for Defendant